R. A. MILLS, Appellant, v. CHARLES L. HALLGREN and JOHN W. SCOTT, Intervener.

JOHN W. SCOTT v. CHARLES L. HALLGREN and R. A. MILLS, Interveners and Appellant.

R. A. MILLS, Appellant, v. PATRICK SHUCKROW and JOHN W. SCOTT, Interveners.

Intoxicating liquors: REVOCATION OF CONSENT: WHO ELIGIBLE TO SIGN

SAME. In determining the sufficiency of a petition for the revocation of general consent to the sale of intoxicating liquor, only the names of those electors actually voting at the last preceding general election should be counted. Electors otherwise qualified but not so voting are ineligible to sign the petition of revocation. Weaver, J., dissenting.

*Appeal from Wapello District Court.*—HON. C. W. VERMILLION, Judge.

SATURDAY, FEBRUARY 19, 1910.

PETITIONS in the entitled causes were presented to Hon. C. W. Vermillion, a judge of the Second Judicial District, and a hearing on April 12, 1909, ordered. Subsequently petitions of intervention praying for the same relief and answers to both pleadings were filed. A hearing was had, at the conclusion of which temporary writs of injunction were denied and from this ruling in each case R. A. Mills appeals.—*Affirmed.*

*Chester W. Whitmore, W. W. Rankin,* and *Wm. McNett,* for appellant.

*Jaques & Jaques* and *Smith & Lewis,* for appellees *Hallgren* and *Shuckrow. H. W. Byers,* Attorney-General, and *George Cosson,* by permission, file a brief in behalf of appellant.

LADD, J.—The defendant in the first two actions, Hallgren, and Shuckrow, the defendant in the third, were engaged in selling and keeping for sale intoxicating liquors in their respective places of business in the city of Ottumwa. A written statement of consent in pursuance of section 2448 of the Code had been filed with the county auditor of Wapello County in February, 1900, found sufficient by the board of supervisors, and its finding en-

tered of record.    Section 2450, Code.    On December 22, 1908, a verified petition, requesting that the bar to prosecutions of persons interposed because of compliance with section 2448 of the Code cease to operate, was filed with the county auditor.    Notwithstanding the filing of such petition, the defendants continued to handle intoxicating liquors as before.    It is conceded that all the provisions of the mulct law had been complied with by them, and the only question presented on this appeal is whether the petition of revocation was signed as required by statute.    For a clear understanding of the point involved portions of the statute may be set out.    Section 2448, Code Supp. 1907:

In any city, including cities acting under special charters, of five thousand or more inhabitants, no proceedings shall be maintained against any person who has paid the last preceding quarterly assessment of mulct tax, nor against any premises as a nuisance on account of the selling or keeping for sale therein or thereon, by such person, of such liquors, provided the following conditions are complied with; and in any city of over twenty-five hundred and less than five thousand inhabitants, when a written statement of consent that intoxicating liquors may be sold in such city, signed by eighty percent of the voters residing in such city, voting therein at the last preceding election, as shown by the poll list of said election, shall have been filed with the county auditor, and shall by the board of supervisors at a regular meeting, or at a special meeting called for that purpose, have been held sufficient, and its findings entered of record, which statement, when thus found sufficient, shall be effectual for the purpose herein contemplated until revoked, said city shall come within the provisions of this section:

1.  .  .  .    A written statement of general consent that intoxicating liquors may be sold in such city, signed by a majority of the voters residing in such city, voting therein at the last preceding election, as shown by the poll list of said election, shall have been filed with the county auditor and shall, by the board of supervisors, at a regular

meeting, have been held sufficient, and its finding entered of record, which statement, when thus found sufficient, shall be effectual for the purpose herein contemplated, until revoked, as hereinafter provided.

Then follow eleven other subdivisions, not pertinent to the present inquiry. Section 2449 has reference to the bar in cities under five thousand inhabitants, and towns. Section 2450 provides for the canvassing of the statements of consent and the entry of record of its findings, and provides for appeal therefrom. Section 2451, Code Supp. 1907:

Whenever any of the conditions of the third preceding section shall be violated, or whenever the council of the city or town or city acting under special charter shall by a majority vote direct it, or whenever there shall be filed with the county auditor a verified petition, signed by a majority of the voters of said city, town or city acting under special charter, or county as the case may be, as shown by the last general election, requesting it, then the bar to proceedings as provided in the second and third preceding sections shall cease to operate and the persons engaged in the sale of intoxicating liquors shall be liable to all the penalties provided in this chapter.

The petition of December 22, 1908, was filed in pursuance of section last quoted, and, according to the findings of the district court, two thousand eight hundred and ninety-nine names appeared thereon. Ten of these appear not to have been genuine, nineteen were twice signed, and nine differed so materially from names on the poll lists that they were held not to have been sufficiently identified. There were one hundred and twenty-nine names of persons not shown to have been qualified voters. It is conceded that all of these, one hundred and sixty-seven in all, should be eliminated from the petition, leaving two thousand seven hundred and thirty-two names thereon. Of these one hundred and ten were names of qualified

electors who might have voted at the last preceding election, but did not, though forty of them had registered for that purpose. At the election of 1908, five thousand, three hundred and fifty-three votes were cast in the city of Ottumwa, a majority of which is two thousand, six hundred and seventy-seven. So that, if those only who voted may be counted in ascertaining the sufficiency of the petition, it must be held that less than the majority required signed it, and therefor the bar of the mulct law was not removed. If, however, the poll books are to be looked to merely to ascertain the number which will constitute a majority, and those qualified to vote, regardless of whether they cast ballots at the last preceding election, if they sign the petition, are to be counted, then the petition was sufficient, and defendants should have been enjoined from continuing the business in which they were engaged. It will be noted that the written statement of consent to be sufficient in a city like Ottumwa must be "signed by a majority of the voters residing in such city, voting therein at the last preceding election, as shown by the poll list of said election;" while the petition of revocation must be "signed by a majority of the voters of the said city, . . . as shown by the last general election." As argued by appellant, the procedure for the interposition of the bar of the mulct law is more carefully guarded than that for its removal, but the sentences quoted prescribe the ultimate test to be applied in determining the effectiveness of the written statement of consent and of the petition for revocation. The former is specific in limiting the voters to those voting at the last preceding election, as appears from the poll books, and who are residents of the city at the time of signing the statement, while the latter in general terms defines the majority of voters whose signatures are required to be "as shown by the last general election." Appellant contends that the last general election is referred to only as indicating the number of

signatures required, and that the word "voters" is employed as equivalent to qualified electors, while appellees, conceding that the majority must be of those who voted, argue that by "voters" is meant those who cast ballots at the last election. The word, as ordinarily used, has two meanings: Persons who perform the act of voting, and persons who have the qualifications entitling them to vote. *In re Denny,* 156 Ind. 104· (59 N. E. 359, 51 L. R. A. 722).

In *Sanford v. Prentice,* 28 Wis. 362, the court said that: "There is a difference between an elector or person legally qualified to vote and a voter. In common parlance they may be used indiscriminately, but strictly speaking they are not the same. The voter is the elector who votes; the elector in the exercise of his franchise or privilege of voting, and not he who does not vote." Accordingly, it was held that a statute declaring that a "majority of legal voters" of a school district may determine the amount of money to be levied and collected at a special or annual election of said voters meant a majority of those actually present and actually voting and not of the qualified electors residing in the district. In *County of Cass v. Johnston,* 95 U. S. 360 (24 L. Ed. 416), the Supreme Court of the United States, in construing a provision of the Constitution of Missouri prohibiting subscriptions by a township to the capital stock of a railroad company "unless two-thirds of the qualified voters . . . of the town at a regular or special election to be held therein shall assent thereto," held that this exacted the assent of two-thirds of the qualified electors actually voting. The decision was followed in *Carroll County v. Smith,* 111 U. S. 556 (4 Sup. Ct. 539, 28 L. Ed. 517), considering an act of the Legislature of Mississippi authorizing the issue as to whether subscriptions to the capital stock of a corporation should be made be submitted "to the decision of the qualified voters of said county, city or town . . .

and if two-thirds of said qualified voters be in favor of said subscription," and bonds issue for that purpose, and a provision in the Constitution of Mississippi like that of Missouri quoted above.    The court, notwithstanding a construction to the contrary by the Supreme Court of Mississippi (*Hawkins v. Board of Supervisors of Carroll County,* 50 Miss. 735), declared that "the words 'qualified voters,' as used in the Constitution, must be taken to mean not those qualified and entitled to vote, but those qualified and actually voting.   In that connection a voter is one who votes; not one who, though qualified to vote, does not vote."   In *Vance v. Austell,* 45 Ark. 400, an article of the Constitution of Arkansas prohibiting the establishment or change of a county seat "without the consent of the majority of the qualified voters of the county" was construed to mean a majority of those who participated in the election.    Other decisions to the same effect might be cited while a different view has been maintained by several courts.   See *Southerland v. Town of Goldsboro,* 96 N. C. 49 (1 S. E. 760); *Cocke v. Gooch,* 5 Heisk. (Tenn.) 294; *Hawkins v. Carroll Co.,* 50 Miss. 735.    A statute of this State conferred upon cities and incorporated towns the power to erect or authorize the erection of waterworks, but provided that "no such works shall be erected or authorized until a majority of the voters of the city or town, at a general or special election by vote approve the same."   In construing it this court held that the approval exacted was that of the majority of the voters actually voting at the election.   *Taylor v. McFadden,* 84 Iowa, 262.

The meaning of the word "voters" depends on the connection in which used, and is not always equivalent to "elector," as seems to be assumed in the arguments of appellant.   Recurring to the language of the statute, we inquire:   Why is the last election to be referred to?   Manifestly to ascertain the majority of voters.   It so reads.

Of what voters? Necessarily those who voted, for none other are shown by the election records. It is not the majority merely of the voters alone which are to be as shown by the last general election, but the "majority of the voters of the said city." According to the lexicographers, by "majority" is meant the greater number, more than half of the whole number, or of a given number or group. A majority of the voters then must be the greater part of such voters. As said by the district judge in rendering his decision: "If this be true, how can a majority of one group of individuals—in this case the 'voters of said city as shown by the last general election'—consist in part of individuals not belonging to that group at all, but to an entirely different class, persons not shown by the election to be voters? A majority is a part of the whole number, and can not in the very nature of things be composed of any units that are not themselves included in the whole number. A petition signed only by those not voting might, of course, contain signatures equal in number to a majority of those voting, yet it would not contain the signatures of a majority because the individuals signing it did not constitute any part of the whole number of those voting. If they were not a part of the whole, they could not of course, be a part of any fraction of the whole. There is an obvious contradiction involved in saying that a majority of those voting may be composed in whole or in part of those not voting. The difficulty may be avoided, but not overcome by saying, as do counsel for Mills in the brief submitted, that the requirement that the petition be signed by a majority, as shown by the last general election, means such a number of voters as equals a majority of the total number of votes cast. This, while a frank and very concise statement of what counsel claim the statute means, is very far from being a paraphrase of its language. It is the expression of an entirely different idea. Under this language used by counsel to state what

they claim the statute means, the signers need not consti-
tute a majority—more than half—of those voting but need
only equal such a majority in number, which is plainly a
very different thing." We are of opinion that, to be
effective in removing the bar of the mulct law, the peti-
tion of revocation must be signed by a majority of those
voting at the last general election. We are the more in-
clined to this view because of the specific requirements as
to signers of the statement of consent. While, owing to
differences in procedure in the establishment and removal
of the bar, no attempt should be made to harmonize the
provisions, any inconsistency between the two statutes
should be avoided if possible. Should the construction
contended for by appellant obtain, then a statement of
consent signed by the majority of electors voting might be
overcome immediately by the minority of those voting
joining those opposed to the liquor traffic not voting. The
design of the lawmakers seems to have been to leave the
question as to whether the traffic in intoxicating liquors
be carried on in the several communities of the State to
those who have manifested their interest in public affairs
by casting the ballot. So manifest was this that this court
so assumed in *State v. Ashert,* 95 Iowa, 210; *McConkle
v. Remley,* 119 Iowa, 512, and *Tuttle v. Poechert,* 143
Iowa 446. The denial of the temporary writ of injunc-
tion in each suit has our approval.—*Affirmed.*

WEAVER, J.—(Dissenting). The statute providing for
the adoption of the mulct law by a city of more than five
thousand inhabitants requires that the written statement of
consent be signed by a "majority of the voters residing
in the city, voting therein at the last preceding election as
shown by the poll list of said election" (Code, section
2448); while the petition which shall operate to revoke
such adoption is required to be signed by a "majority of
the voters of said city . . . as shown by the last gen-

eral election" (Code, section 2451). The difference in the language of the two provisions is very marked—a majority of the voters of the city voting therein at the last preceding election as shown by the poll list of said election is one thing, a majority of the voters of the city as shown by the last general election is an altogether different thing—and it is inconceivable that an intelligent Legislature should have made use of both descriptions in the same statute to express the same idea. To secure the statement of consent, its promoters must look to the poll list of the preceding election, whether general or municipal. There they are to find the specifically named persons the signatures of a majority of whom must be obtained. To secure a revocation the opponents of the mulct law must present a petition signed by a majority of the voters of the city as shown by the last general (not municipal) election. In this provision no reference is made to the poll lists. The majority here required is not a majority of the particular individuals who voted at the last general election, but a majority of the entire body of voters, the entire electorate of the city, which for the purposes of this provision is assumed to equal in number the aggregate vote shown by the last general election. For the statutory distinction between general elections and municipal elections, see Code, section 1089.

The voters shown by such election may or may not be equal to the number of names on the poll list. If asked to determine the number of votes cast at any given election, we do not look to the poll list, but to the officially canvassed result. If, for instance, a statute be enacted authorizing the imposition of a tax in aid of the construction of a railroad upon vote of a majority of the voters of a city as shown by the last general election, it would hardly be contended that such provision meant a majority of the particular individuals voting at such election, yet that is precisely what we would be required to hold to be con-

sistent with the position taken by the majority opinion. Taking the result of the last general election as the statutory standard for determining the number of voters of the city and not as designating a list of individuals who have an exclusive right to be heard on the subject, the petition of revocation was sufficient, and in my judgment it should have been so held by the trial court. The precedents cited in the majority opinion are to my mind entirely inapplicable to the issue here being considered, but I will not prolong this discussion to enter upon their review. The distinction sought to be drawn between "voters" and "qualified electors" is entirely too fine for practical purposes. Our laws are made by representative citizens, chosen from every walk of life, who use words according to their ordinary and accepted meaning, and it is not, I respectfully contend, the proper province of the court to neutralize or destroy their effect by extraordinary and unusual interpretations which we may be morally certain never entered the mind of the legislator.

I think the judgment below should be *reversed*.